I'm Blaine Connaughton. I represent Victor Santa Cruz Barriga and I anticipate taking less than five minutes since I'll be sharing argument with Mr. Hermel who represents Mr. Valencia. The initial matter I wanted to address was the issue of the Terry stop. We have two unknown persons leaving a home in a black pickup truck. The person who was under suspicion was driving a red pickup truck, went to a home on 15th Avenue in Yakima, entered the home apparently, although they initially had the location of the home incorrect. In any event, they were surveilling the home. It was very dark outside. The car was way back according to the agents and they saw two individuals in the dark enter a black pickup truck. There were a total of three pickup trucks at the location. They left. They followed the truck. The testimony at the suppression hearing was that the two individuals were completely unknown. They were cross-examined on that repeatedly by myself. The two agents, I think three agents, had testified. They said they didn't know who it was. They didn't know if it was the individual who had been under surveillance because it was dark and they could not see that person when he did the initial exchange when he took the red pickup truck. They had no idea who was in it. They testified on cross that it could have been Mr. Valencia's mother, grandmother, sister, brother. In fact, Mr. Valencia's attorney asked if it could have been him and the agent agreed, yeah, it could have been. So the gist of it is that although they may have had generalized suspicion with respect to the people in that home who they did know who owned it or even who owned this black pickup truck, they had no particularized suspicion. Did they have reasonable suspicion? On a general basis, not as to these individuals. Reasonable suspicion to stop the vehicle with these two people in it. I don't think they did because they didn't know who was in it and they testified that. Counsel, why did they need to know who was in it? Regardless of who was in it, why wasn't there enough for the police to have a reasonable suspicion that it was part of a drug exchange? Well, because I already knew about, I think it was $78,000 in cash. That's a lot of money to carry in your pickup truck. Right. Well, I guess what I'm, I don't believe, I mean, under that scenario than anybody who left that house, albeit the mother, brother, sister who maybe had no idea. Now, why couldn't the mother and the grandmother be dope dealers if they're the ones that are driving away with the stash or the inventory? Well, I suppose they could be, but there was no evidence to support that. I mean, the only evidence was this. Well, there's evidence to support that the occupants of the truck, whoever they were, were. Isn't that so? Possibly. I guess I'm focusing on the particularized suspicion. I don't think they had particularized suspicion because they didn't know enough at that point in time. Here's what I'm getting at. Initially, they didn't stop a man, so they didn't need to know who he is. They stopped a truck, and then one thing built on another, the pictures, the identification. You don't need a lot for a Terry stop, and the Terry stop, it looks like, quickly turned into probable cause for arrest, and also you had the more liberal standard for vehicle search applying. I don't really understand why the fact that they stopped the truck and basically held it until the search warrant came in defeats the search ultimately. Well, let me then go on to the next issue, which is after they stopped the truck, the information that they had was that there was a tote put in the rear of the truck, in the bed of the pickup truck. In fact, there was no tote. It was long, but it was put in the inside of the pickup truck. Additionally, this action, the incident was 1-4-2012. The motion to suppress was 7-12-2012. The government did not reveal the co-banned video of the stop and the dog sniff. In fact, that was uncovered by Mr. Valencia's prior counsel in October of 2012. Let me ask you about that. Let me ask you about that. It looked to me like the most important thing in your case was the negative dog sniff. It's a little bit, although there are all sorts of rationalizations that the government gives for it, it's a little bit like you're getting tested for a vitamin B12 deficiency and the blood test comes back negative. Still, in those circumstances, that doesn't, the doctor, if the clinical indications are great enough, doesn't conclude you don't have a vitamin B12 deficiency. He gives some tests that have more precision. I don't see why the negative dog sniff isn't just one of a totality of circumstances where even though it should have been revealed to the magistrate, it would still leave, even without the magistrate knowing about the negative dog sniff, plenty of probable cause. Well, I don't agree that there was plenty of probable cause. They didn't have any drugs. They never had any drugs until they got this warrant under what I believe, you know, deliberate or reckless behavior by the government. In fact, there was no- What was the deliberate, reckless behavior? Well, they witnessed this dog sniff, which happened 17 minutes after the stop. If you look at the testimony of Agent Leahy, he indicated that they didn't even request this warrant until the stop and the individuals refused to consent to the search. So we didn't have the, you know, it was in process. There were agents out there. He said two agents that were there at all times that he was in direct communication with. So he's talking to these people constantly. Then they conveniently have a canine person from YPD, Yakima Police Department, who pulls over the vehicle, who conducts this search. Now, he's in direct communication. He admitted under cross-examination, as did the agents, that that would be highly significant information to give to a magistrate. And in spite of that, they ignored that. And I would submit that it was deliberate. If you- What is the evidence that it was deliberate? That's what I couldn't find in the record. Well, the evidence, I think, is- Well, let me reference the U.S. v. Jacobs. And it states that, quote, any reasonable person would have known this was the kind of thing the judge would wish to know. So that's a reasonable person standard. These agents testified that they were well-experienced. Leahy said they were part of the team. He had worked with them extensively. They were very experienced. And they all admitted that this is stuff that goes to a magistrate. Now, if that isn't deliberate, that's a reasonable person standard. And we have experienced agents here that have been doing it for years. I believe the one was like 12 years, Leahy even more. But the officer who got the search warrant, he did not act deliberately to suppress it. Well, as far as we know, I guess I'm always- We only have the record. Well, we have-that's right, if you believe that. But the case law is that we have collective knowledge, which they're using against us, collective knowledge of agents they're using against the defendants. But you're supposed to ignore that in the context of pursuing this warrant. But if the officer who was taking the warrant to the magistrate believed there was enough probable cause, why would this matter? And it appears there was probable cause. Why would this matter? Well, I don't think there was probable cause. I disagree with that. So your argument rises and falls on that. Well- Because if someone disagrees with you- You know, they knew Mr. Rendon for about three hours. The suggestion is this was this highly reliable informant. He had no background with law enforcement. They'd never dealt with him before. They found cash in his truck in Idaho, and that was the same day of this, and then they came over and did this meeting. But the details he relayed to them, I mean, everything that happened, all that. They panned out. Yes, they certainly did. You have 37 seconds. I don't know if you want to reserve the rest for- I don't. I'm going to give that to Mr. Hormel. But I would point out in De Leon, they said, as the Supreme Court noted in Frank's, police cannot insulate one officer's deliberate misstatements merely by relaying it through an officer affiant personally ignorant of its falsity. In the present case, both of these agents testified they saw it, they witnessed it, they gave false testimony as did the police officer as to when it occurred in the context of the stop, and they were in direct communication with Leahy, who was in direct communication with the U.S. attorney, who then went to Judge Hutton. So I think that if that's not deliberate, then they're always insulated from it. Thank you. He's used all your time, so sorry about that. I'll give you a minute for rebuttal. So go ahead. Good morning, Your Honors. My name is Ani Ahmed. I represent the Eastern District of Washington. The district court in this case correctly found that there was reasonable suspicion. Certainly the stop, the initial stop, was justified. And while defense counsel do rely on Davis and Jacobs as their seminal cases, as pointing out that the government committed misconduct in this case and that the canine search should have been included within the affidavit, I would point out that the facts of those cases are very different in this case. As the district court found, there were ample facts to justify this case. In fact, the confidential source makes many points that are against his penal interest, including the fact that he states that, I've made seven prior trips, five to California and two to the Yakima area. In fact, he tells law enforcement, I made one prior trip just a couple weeks ago on December 20th. The stop occurred, in this case, on January 4th. And he tells law enforcement, I picked up 21 pounds of methamphetamine and delivered $130,000 just two weeks ago in the Yakima area, and this is exactly how I do it. And he tells law enforcement that he goes to a hotel, he waits for an individual by the name of Hugo after he contacts a supplier by the name of Kiko. He actually names the person he delivers the methamphetamine to in Minnesota. He tells law enforcement how much he's paid, $5,000. Law enforcement, with his permission, attached trackers to the vehicle, two of them. And they conducted an investigation. Everything is proper at that time. And I would point out to the court that while counsel states that officers did not know who had gotten into the vehicle, I would point out that that was during the testimony of Officer Walters. And Officer Walters stated unequivocally that he did not know. He had a different vantage point than other officers had. He did not know who had gotten into the vehicle. He did not see who had gotten into the vehicle. He had learned from Officer Stanley, who was in a better position to view the two individuals coming out of the house, that there were two males, one with a tote bag. Now, correct, in the initial affidavit, it says, back, or I'm sorry, the bed of the truck. As Officer Walters explained, when he was typing up the second warrant a week later for Mr. Bariga's residence, he explained that during his testimony. He said, that is what Officer Stanley told me, that he saw somebody put the tote bag in the bed of the truck. I would point out, Your Honors, that in this case, there is evidence in the record to indicate it was nighttime. And the officers certainly weren't within a few feet of the defendants. They were from different vantage points of surveillance. And Officer Walters stated that. Well, we're using collective knowledge. Mr. Hormel, there's an interesting point. We use collective knowledge for the support of the state, or you're arguing it and relying on it. Why don't we do that when it comes to the dog sniff? And I'm a little interested in hearing from the government regarding the dog sniff and why the negative response did not get communicated to the officer who was presenting the warrant. Your Honor, let's assume that we do, in terms of the negative dog sniff, attach collective knowledge. Would that negate the reasonable suspicion in this case, in the fact that the confidential sources made all these statements? Well, let me ask you, do negative dog sniffs dramatically reduce the likelihood of methamphetamine being found in the truck? I mean, because normally, when it's the other way around, you argue that it does. Your Honor, I would tell the court, based on the record that Officer Lee, who was the canine officer, explained that there are many times that the dog does not alert on the vehicle when, in fact, methamphetamine or drugs are found in the vehicle. He also indicated that there are false positives where the dog does alert. It's not 100% reliable in any case where a dog is involved and alerts on the vehicle. I couldn't tell the court, regardless of the Harris decision pointed out in the defendant's briefs, I couldn't tell the court that a canine sniff is 100% either way. So you don't think if Officer Lee had gotten a positive sniff, he would have gotten that information to the detective? Not in this case, Your Honor. Why? He just did it for his exercise? It was just for no reason at all? I mean, just for kicks? Absolutely, Your Honor. I would tell you this, the fact that he does it 18 minutes, according to the video, 18 minutes after the stop corroborates the fact that there was no intent to do a dog sniff to corroborate or provide probable cause in this case. Lee testifies over and over again that I was only asked to stop the vehicle. I was there for initial briefing. I knew there was a drug transaction involved. I knew that there was money involved, but I was not there to do a canine sniff. Now, if, in fact, he's using... Well, then why did the canine sniff occur? Well, he explains that during his testimony. He says, and the record indicates that they're standing around. Even the video shows it. They're standing around for 18 minutes. And Lee says, I know that Agent Leahy is going to get in the warrant. I know that at this point. And I turned to the other agents and asked, do you mind if I run the canine around there? Go ahead. I think he's using it. He doesn't use the word training exercise during his testimony, but he does explain that I'm running the dog around just to see if it hits. It hits on the car. Now, the evidence in this case indicates, which is undisputed, that Agent Leahy never knew that the dog had been running around the car. In fact, Agent Leahy testifies that the first time he finds out about a dog being run around the vehicle is during Officer Lee's testimony during the first suppression hearing. And while defense counsel wants to say, well, it was some sort of misconduct for the government to keep this video out, the case agent never knew, number one, that a canine had been run around the vehicle until Officer Lee testifies during the first suppression hearing and that there was a video in his case. And that was provided very quickly right after it was learned that there was a video on Officer Lee's vehicle. There was no intent to hide that video from anybody. It was not an issue at the time in terms of the first suppression hearing. I would tell the court that Officer Lee testified and told the district court that it was never his intent as being part of this investigation to run a canine. It only makes sense, based on the facts themselves, that waiting 18 minutes, what officer would wait 18 minutes to corroborate probable cause when he has a canine sitting in the back of his vehicle? Well, then why was there this discrepancy that he waited 45 minutes but then later found out it did wait, it was only 18 minutes? Some of that doesn't, it's odd. Your Honor, I would tell you this. If you look at Officer Lee's testimony that I've cited in my brief, he's not sure of the time. He says that over and over again. It seemed to me, and I'm paraphrasing a bit, he says it seemed to me it was a long time. I believe it was 45 minutes to an hour. And so I would tell the court that the record indicates it was about 18 minutes after the initial stop that he deploys his canine. And the video also shows, based on the record, that they're standing around. He's talking to other agents. I believe Officer Walters was there, who's a task force officer, and he says, do you mind if I run the dog around the vehicle? And by this time, the timeline shows that the warrant was being signed at 7.56. The record also shows, based on Agent Leahy's direct testimony, that Leahy points out there were problems with communicating the information to the magistrate in terms of a fax machine, in terms of then it being emailed to the magistrate, and then it finally being signed off. Agent Leahy, the first time he appears on the scene, contrary to what's cited in United States v. Davis, where the agent was actually there at the scene, Leahy says, I never even got to the scene until I got the warrant signed. That's the first time Leahy gets to the scene. And the record shows that the first time Leahy even finds out that there was a dog search, based on his direct testimony at the suppression hearing, was when Leahy testifies during the first suppression hearing. That's what he says during his testimony. That's when I found out that there was a canine sniff. And so while I would tell the court that a negative dog search, in this case, we argued it from the point of misconduct. Did the government intentionally or recklessly not put that in the affidavit, unlike the Jacobs case, where the agent absolutely knew, when he wrote that to the magistrate and said, yeah, the dog showed interest in this case, but he also knew that the dog did not alert because the canine officer told him that, and he didn't tell the magistrate that. That's misconduct. That's lying to the magistrate in that case. In Davis, which I would point out, they saw Mr. Davis with Mr. Presley, who was the drug kingpin, for a few minutes, and he had detergent boxes. The court in that case said the stop of Davis for an hour, that's absolutely okay. They wait one hour for the canine to get there. In this case, Officer Walters testifies that they confirmed identities within five to ten minutes. In fact, I believe the words almost immediately were used by Officer Walters. So ultimately, you're telling me that even if it was just for exercise, as you're asserting now, if there had been a positive dog sniff, you would not be arguing that that further corroborated that there were drugs in the car, that you would never do that? I couldn't judge because it's not within the four corners of the warrant. But let's just say it had, and you were able to add that to the probable cause statement, would you? Absolutely. Absolutely. If it's a certified dog judge and it's properly trained and there's no attack in terms of its ability to detect narcotics, would I include that in affidavit? Absolutely. I would. I think it lends to the credibility of whether there was a probable cause. In this case, though, even with a negative dog sniff right there, you had so much corroborating evidence that, in fact, they had reasonable suspicion to stop the vehicle. And as the district court correctly found, once their identities were confirmed, then you had probable cause because the confidential source says, these are the fellows I dealt with two weeks ago. In fact, I think I dealt with Mr. Valencia on a prior occasion as well, the other occasion that I came in. So once their identities are confirmed, I think that, in fact, as the district court correctly found out, that they had probable cause. Thank you. Thank you, Judge. I'd like to hit very quickly the issue of probable cause. State your name. Steve Hormel for Mr. Valencia. Oh, you're Mr. Hormel. I am Mr. Hormel. I'm sorry, I had you confused. Yes, and I did the briefing on the issue regarding the DVD. I think what needs to be highlighted is a couple things. Number one, this was an investigation about a red truck, no information about a black truck being involved whatsoever. So the investigation switches from a red truck to a black truck. So what circumstances do you have to indicate that there was any contraband placed in the black truck? It's an observation by an officer who says a tote was placed in the bed of a truck. And I think it is important. I think that's very critical because the DVD shows the law enforcement officers during the time of the three circles around the truck searching the bed of the truck. So what remains, so what the significance of the dog sniffs is, number one is, is to dispel or confirm whether or not narcotics are in the truck. And the United States Supreme Court has recognized the drug dog sniff as a tool that either confirms or dispels the presence of drugs in luggage. And I cited that case in my brief. So I think that the switching of the investigation from a red truck to a black truck, the fact that the tote was not seen in the bed of the truck, and the DVD shows the police officers searching the bed of the truck, and the other important factors, Your Honors, are the law enforcement officers were poking their heads in the truck and searching with their flashlights and didn't report seeing a tote inside the truck either. So I think during the circumstances of the DVD, the DVD speaks for itself. But when you see the progression of the investigation, the investigation is an ongoing investigation. It's not a training exercise for the dog. The officer did exactly what officers do. He asked for consent first. When he didn't get consent to search the truck, then he told Mr. Valencia, I have the right to run my dog around your truck. Would you allow me to roll up your windows? So I would like the court to highlight at least those facts. Thank you. Thank you. We did. Oh.  Sorry. Mm-hmm. Judge, we're working on getting that. Okay. We're connecting. Judge, I'm here. I'm disconnected. Judge Kleinfeld, can you hear us? We can hear you now. I can hear you fine. Can you hear me? Can you hear me? Yes. All right. You're all set, Judge Kleinfeld. Sorry about the interruption. Yes. It's working now. Good. Judge Kleinfeld. I could hear fine on the argument, but no one could hear me. All right. I'm sorry. I just made aware of that. Do you have any questions for the lawyers before we conclude? I did have questions that I was trying to ask, if you don't mind. Sure. Of course. I appreciate hearing from government counsel on something. Yes, Your Honor. I had a question for you. My thought was, frankly, that the argument you presented was highly implausible in some respects. The negative dog sniff struck me as something a magistrate would want to know. Back when I was a magistrate, I sure would have wanted to know it, that there was a negative dog sniff. Now, you could tell from my question to your adversary that I was influenced by this First Circuit case, the United States versus Joe Doying case, where then-Judge Breyer said that a negative dog sniff is just one of the circumstances, amidst the totality of circumstances, and it isn't decisive. Nevertheless, I thought they would have wanted to know. Combining that with the false statement, whether honest or dishonest, about the 18 minutes versus the 45 minutes, and combining that with the failure to turn the recording over to defense counsel in a timely manner, and, as I recall, misleading defense counsel on whether there was a recording, I'm not inclined to just fall all over myself attributing credibility here to the government side of the case. However, what I want to know is, I know there's an Eighth Circuit case that says, if that's so, you go to a Franks hearing, and that's the end of it. But I'm not sure that's true in the Ninth Circuit, and I want to know if we accept the proposition that even if the magistrate did know about the negative dog sniff, it wouldn't have made a difference. Is there a Ninth Circuit law that says whether we have to go any further with it if we reach that conclusion? Do you understand my question? I do, Your Honor, and I want to address each point that Your Honor brought up. Number one, the negative dog search. I'm asking you to hypothesize that we just think there was a negative dog search. The magistrate would have wanted to know it, and it's just plain dishonest that it wasn't given to the magistrate. Go from there. Based on that hypothesis, Your Honor, I believe that it would have been improper misconduct by the government if it knew that there was a negative dog search, and it intentionally did not put that in a warrant. And, in fact, Agent Leahy says that during his direct testimony. So we would have to reverse that if we could reach that conclusion? If you found it, I would tell the court this, that there was reasonable suspicion to stop the vehicle. There was probable cause in this case. But, certainly, if this court finds that the government intentionally committed misconduct, it's certainly within its purview to reverse the case based on government misconduct. But I would tell Your Honor this. Number one, Agent Leahy says during his direct testimony, if I knew that there was a negative dog search, I would have put it in the affidavit. But it doesn't matter whether he knew because collective knowledge applies. Correct, Your Honor. In terms of, let me just say this. It doesn't indicate. Your hearts and empty heads just don't work on this stuff. But there's no indication that he intentionally or recklessly, regardless of collective knowledge, when he writes the affidavit, he does not know this information. But the district court. The relevant word in what you just said is he. But he doesn't matter. Collective knowledge controls. Well, let me explain. The district court found that. So I think you're conceding that if the police collectively knew that there was a negative dog sniff and it was not revealed to the magistrate and that it was an intentional hiding of the negative dog sniff, then we have to reverse. I think that's what you just said. Well, I think, Your Honor, what I would say is this. The Davis case, actually, which is cited in the defendant's brief, they say it really doesn't matter whether the officer knew or not. It's not controlling. They said it may be that the FBI agent didn't know that the first dog sniff was conducted. And it says that's irrelevant to our analysis in determining whether there's reasonable suspicion or probable cause. I will tell the court this. My answer to that is in line with the Davis case, that it really doesn't matter whether the officer knew or not. You changed my inquiry a little bit. I'm saying suppose there's plenty of probable cause even in the face of a negative dog sniff, but it was dishonest, intentional not to reveal the negative dog sniff. Do we have to reverse? No, Your Honor, and I will tell you this. I don't think that you could apply collective knowledge to the fact that an officer intentionally omitted information. You are, when an officer, when you're having a Franks hearing, you're determining whether an officer committed misconduct and lied to a magistrate. I don't think you can apply collective knowledge to that same analysis because what you're doing is. Why not? It's kind of the flip side of Juul analysis. You don't want to know what's in the trunk. Okay, don't tell me what's in the trunk. And then the person presents, you know about this dope in the trunk? No, I don't know a thing about it. Judge, the example you just said was an act of volition. If an agent said, I don't want to know about this, then the agent is committing an act of volition. And the whole Franks Delaware issue is, the whole intention behind that decision was, we don't want the law enforcement officers to engage in misconduct or lie to magistrates. That's the whole intent of the Delaware Franks decision. If you applied collective knowledge, something that the officer had no knowledge of, and now you're saying, you know what, you were dishonest to a magistrate because this other officer knew something and he didn't communicate that to you and we're applying collective knowledge, how does that affect warrants in terms of honesty to the court? It doesn't. In this case, Agent Leahy testified that he did not know, and the district court said, even if we included that negative dog sniff, I still believe that they had reasonable suspicion to stop the vehicle and probable cause to search it, even if I included it within it. And I would answer your Honor's question with this, the answer is this. You cannot apply collective knowledge in terms of a negative dog search or something that the officer did not know in a Franks hearing, because now at that point you're not deterring anything as a court. You're basically making rules that anything anybody knows applies to everybody in terms of misconduct. Because that's the whole Franks decision. Yes, Your Honor. Do you have anything else, Judge Kleinfeld? No, thank you. Okay. Thank you very much. Thank you, Your Honor. Thank you all for your arguments today, and I apologize for confusing both of the counsel for the appellants. This case is now submitted. Thank you very much.
judges: Alarcon, Kleinfeld, Murguia